1

2

3

4

5

6

7

8

9                  UNITED STATES DISTRICT COURT

10                 EASTERN DISTRICT OF CALIFORNIA

11                        ----oo0oo----

12

13  SUSAN C. ANGELONE,
                                 NO. CIV. S-05-2106 FCD JFM
14           Plaintiff,

15      v.                       MEMORANDUM AND ORDER

16  SEYFARTH SHAW LLP,

17           Defendant.

18                        ----oo0oo----

19      This matter is before the court on defendant Seyfarth Shaw

20  LLP's, ("Seyfarth Shaw") motion for summary judgment or, in the

21  alternative, summary adjudication.  Plaintiff Susan C. Angelone

22  ("Angelone") opposes the motion.  For the reasons set forth

23  below,[1] defendant's motion for summary judgment is GRANTED.

24  /////

25  /////

26  /////

27  _____

28       [1]   Because oral argument will not be of material
     assistance, the court orders this matter submitted on the briefs.
     E.D. Cal. Local Rule 78-230(h).

**BACKGROUND**[2]

Plaintiff commenced suit in this court on October 19, 2005. Her complaint states seven causes of action based upon her employment with and eventual termination by defendant: (1) violations of the Americans with Disabilities Act, (2) violation of the Age Discrimination Employment Act, (3) breach of contract, (4) breach of the implied covenant of good faith and fair dealing, (5) wrongful termination in violation of public policy, (6) intentional infliction of emotional distress, and (7) negligent infliction of emotional distress.

Defendant Seyfarth Shaw hired plaintiff Susan Angelone as a temporary paralegal in January 1999 in its Sacramento office.[3] (DRDF ¶ 19).  In March 2000, Defendant hired plaintiff as a permanent legal secretary.  (DRDF ¶ 20).  Plaintiff was initially assigned to assist two Seyfarth Shaw attorneys, David Tyra ("Tyra") and Sam McAdam ("McAdam"), and was later assigned a third attorney, Steve Greene ("Greene").  (DRDF ¶¶ 6, 7, 10).  In

---

[2]    For the purposes of this motion, the court recounts plaintiff's version of the facts, except where otherwise noted. (Pl.'s Stmt. of Material and Disp. Facts in Opp'n to Def.'s Mot. for Summ. J. ("PSDF"), filed February 7, 2007).  Where the facts are undisputed, the court refers to the parties' statements of undisputed facts.  (See Pl.'s Response to Def.'s Separate Stmt. of Undisp. Material Facts ("PRUF"), filed February 7, 2007; Def.'s Response to Pl.'s Separate Stmt. of Material and Disp. Facts in Opp'n to Def.'s Mot. for Summ. J. ("DRDF"), filed February 23, 2007).

[3]    Defendant objects to various pieces of evidence that plaintiff presents in opposition to this motion.  Much of the evidence that defendant objects to is immaterial to the court's analysis of the motion.  To the extent that the evidence is relevant, the court declines to rule on defendant's objections to plaintiff's evidence because, for the reasons stated herein, even considering this evidence, it fails to raise a triable issue of fact sufficient for plaintiff to withstand summary judgment.

2000, plaintiff received positive performance evaluations from Tyra and McAdam and was given a raise. (Pl.'s Decl., filed February 6, 2007, Exs. 1-3). In 2001,  McAdam and Greene gave plaintiff generally positive reviews, with Greene noting only one area in need of improvement. (Id., Exs. 5, 6).  In contrast, Tyra noted 21 areas where plaintiff's performance required improvement. (Id., Ex. 4)  Tyra's overall rating of plaintiff was "requires some improvement." (Id.).  Nevertheless, plaintiff received another raise. (Id., Ex. 7).

In January 2002, Angelone began suffering inflammatory and painful arthritic symptoms, which were later diagnosed as migratory polyarthritis. (PSDF ¶ 40; Declaration of Charles Sutter, M.D., filed February 2, 2007, ¶¶ 11-13).  Plaintiff began a six-week disability leave on April 29, 2002. (DRDF ¶ 42).  Her leave was extended several times, for a total of more than eight months, until plaintiff returned to work in January 2003. (DRDF ¶¶ 45, 47).  Upon plaintiff's return, her doctor restricted her to a part-time work schedule of only five hours per day, with an additional restriction of "limited standing at work." (DRDF ¶ 47; Sutter Decl., Ex. 1.)

Defendant approved plaintiff's part-time schedule and assigned another employee, Anthony Musante ("Musante"), to assist Plaintiff with her workload. (DRDF ¶¶ 48, 50).  Plaintiff voiced concerns, however, that Musante sometimes refused to assist her with her workload and assisted other legal secretaries instead. (DRDF ¶ 53).

In January and February 2003, Greene and McAdam completed performance evaluations of plaintiff for the eight months

1  preceding plaintiff's disability leave.  (Pl.'s Decl., Exs. 15,
2  16.)  Both attorneys gave plaintiff positive evaluations, with
3  Greene noting only one area requiring improvement.  (<u>Id.</u>).
4  Plaintiff received a four-percent raise based upon these
5  evaluations.  (Pl.'s Decl., Ex. 17.)

6      Gail Baum, the office administrator for the Sacramento
7  office, notified Angelone that she must return to work on a full-
8  time basis by the end of March 2003, or face termination.  (DRDF
9  ¶ 55).  Plaintiff believed that Seyfarth Shaw's policies, as
10  expressed in the employee handbook, allowed her a full year to
11  return to full-time status and raised this issue with Baum.
12  (PSDF ¶ 56).  Despite this dispute, plaintiff asked her doctor to
13  release her to full-time status, which he did on March 24, 2003,
14  with a restriction against prolonged periods of standing.  (DRDF
15  ¶ 59; Sutter Decl., Ex. 1.)

16      On March 21, 2003, plaintiff met with Baum, McAdam and
17  Greene to discuss appropriate accommodations for plaintiff's
18  medical condition.  (Def.'s Separate Stmt., of Undisp. Material
19  Facts ("DSUF"), filed December 21, 2006, ¶ 62).  According to
20  defendant, McAdam and Greene both agreed to allow Plaintiff to
21  make a limited number of scheduled trips to their offices each
22  day.[4]  (Decl. of Samuel T. McAdam, filed December 21, 2006, ¶¶ 5,
23  6; Decl. of Gail Kristine Baum, filed December 21, 2006, ¶¶ 13,
24  14).  Additionally a printer was provided next to plaintiff's

25

26  _____

27      [4]    Plaintiff objects to various pieces of evidence that
    defendant presents in support of its motion.  To the extent that
    the evidence objected to by plaintiff is relevant, the court
28  finds that plaintiff's objections are without merit.

workstation and McAdam moved his files closer to plaintiff.[5] (DSUF ¶ 38).  Plaintiff states that Baum informed her "there was a limit as to how much Seyfarth Shaw would do to accommodate" plaintiff's restrictions.  (PSDF ¶ 61).

Soon after plaintiff returned to full-time status, she was reprimanded for making personal phone calls and violating the dress code.  (PSDF ¶ 67, 68).  Plaintiff asserts these reprimands were unwarranted, as other employees violated the dress code without repercussion and that her personal phone calls were related to treatment of her medical condition.  (Id.; Pl.'s Decl. ¶¶ 65-67; Decl. of Sue Kyle, filed February 2, 2007, ¶ 6; Decl. of Kirk Guthrie, filed February 2, 2007, ¶ 13).

In May 2003, an administrator from Seyfarth Shaw's Chicago office, Shirley Kitzmann ("Kitzmann"), interviewed employees in the Sacramento office regarding Baum's performance.  (DRDF ¶ 73). During her meeting with Kitzmann, plaintiff raised a number of issues, including her belief that Baum inadequately handled accommodation issues.  (Id.).  Baum resigned her position within days of Kitzmann's meetings with the Sacramento employees and a new office administrator, Rachel Miller ("Miller"), began work in June.  (PSDF ¶¶ 74, 75).

Plaintiff met with Miller in early July 2003 and informed Miller of her medical condition, her walking restrictions, and her belief that Baum had failed to accommodate these

---

[5]     Plaintiff claims that Seyfarth Shaw *offered* her satisfactory accommodations during this meeting, but that such accommodations were not actually *provided*.  (PRUF ¶ 36). Plaintiff does not specify what accommodations were not provided, however.

restrictions.  (DRDF ¶ 76).  Shortly after this meeting,
plaintiff provided Miller with a note from one of her doctors,
indicating plaintiff's need to wear shoes designed for arthritic
patients.  (DRDF ¶ 77; Pl.'s Decl., Ex. 18).

Plaintiff was assigned to work for a third attorney, Anna
Ngo Clark ("Clark") in April 2003.  (DRDF ¶ 72).  In July and
August 2003, all three attorneys to whom plaintiff was assigned
completed performance evaluations of plaintiff.  (Pl.'s Decl.,
Exs. 19, 20).  While McAdam gave plaintiff an overall rating of
"meets expectations," he noted that plaintiff was "defensive and
somewhat non-cooperative," and that plaintiff's "communication
and commitment to working as a team is an area that needs
improvement."  (Id., Ex. 19.)  McAdam also suggested that
plaintiff move to another section of the office in order to
reduce the amount of walking she had to do.  (Id.).  Greene gave
plaintiff an overall rating of "meets expectations" and Clark
rated plaintiff as "exceeds expectations."  (Id., Exs. 19, 20).
Neither Green nor Clark noted any areas in which plaintiff was
performing below expectations.  (Id.).  Plaintiff received
another raise in August 2003.  (Id., Ex. 19.)

Sometime around August 2003, Clark asked plaintiff to make
numerous trips to her office.  (DRDF ¶ 79).  Plaintiff began
suffering more frequent symptoms of her arthritis and discussed
her medical condition with Clark.  (Id.).  Plaintiff informed
Miller of her conversation with Clark and Miller assured
plaintiff she would discuss plaintiff's condition with Clark.
(PSDF ¶ 80).  Clark states that she first learned of plaintiff's

standing restriction around this time.  (Decl. of Ana Ngo Clark, filed December 21, 2006, ¶ 4; DRDF ¶ 79).

On November 5, 2003, plaintiff sent an email to Kitzmann, discussing a recent complaint McAdam had made regarding plaintiff's handling of an assignment from him.  (PSDF ¶ 82; Pl.'s Decl., Ex. 21).  Plaintiff complained to Kitzmann of "favoritism" in the Sacramento office and specifically noted that she felt she had been "singled out" since her return from disability leave.  (Pl.'s Decl., Ex. 21.)

On November 24, Clark sent three emails to Miller, complaining of plaintiff's unresponsiveness to assignments. (DSUF ¶¶ 17, 18; Amended Decl. of Rachel Miller, filed February 7, 2007, ¶ 11; Decl. of Patricia Cullison, filed December 21, 2006, Exs. 22-24).[6]  Plaintiff was counseled by Miller regarding these complaints and received a warning on December 19, 2003. (DSUF ¶ 19; Miller Decl. ¶ 12).  Clark noted an improvement in plaintiff's performance following this counseling.  (Clark Decl. ¶ 7).  In March 2004, however, Clark again emailed complaints to Miller regarding plaintiff's handling of a request, and in April, plaintiff was again "written up" for questioning an assignment given to her by Clark.  (DRDF ¶ 91; Clark Decl. ¶ 8; Cullison Decl., Ex. 28).

---

[6]     Plaintiff moves to strike the original declaration of Rachel Miller on the grounds that the declaration did not contain a statement that it was made under penalty of perjury.  Defendant responded by submitting an amended declaration of Rachel Miller that does contain such a statement.  The court finds that the omission of this language from the original declaration was the result of oversight and clerical error, which was then corrected by the amended declaration.  Therefore, plaintiff's motion to strike Miller's declaration is DENIED.

On March 4, during a rearrangement of attorney offices, plaintiff requested that Clark move into an office closer to her. (DRDF ¶ 83).  Clark declined to move from her current office, but offered to bring documents to plaintiff when necessary.  (PSDF ¶¶ 84, 85).  Plaintiff contends that Clark did not bring documents to her and instead continued to ask plaintiff to make trips to Clark's office.  (PSDF ¶ 85).  In April, Miller offered plaintiff the opportunity to move her work station closer to Clark's office.  (DSUF ¶ 44; Miller Decl. ¶ 18).  Plaintiff sent an email to Miller on April 8, declining that offer.  (Id.; Cullison Decl., Ex. 32).

On April 2 and again on April 13, Plaintiff requested to be transferred away from Clark and to another attorney with an office closer to her work station.  (PRUF ¶ 43; Cullison Decl., Ex. 33.)  Miller denied both requests for reassignment, citing defendant's policy against transferring employees with ongoing performance problems away from their current supervisors.  (PRUF ¶ 43).

In a May 21 email to Miller, Clark again complained of plaintiff's unresponsiveness, this time to a request to retrieve certain files.  (PRUF ¶ 26; Cullison Decl., Ex 36).  In response to this complaint, Miller again counseled plaintiff.  (PRUF ¶ 26).  Plaintiff asserts that at the time of the request, she explained to Clark that she was experiencing increased swelling and pain, due to a building evacuation the previous day, and asked Clark to seek other assistance in obtaining the files. (Id.).

On May 27, 2004, Plaintiff wrote to Brown, the managing partner of the Sacramento office, regarding her restrictions, requested accommodations, Clark's complaints, and her requested transfers from Clark. (DRDF ¶ 93). Plaintiff's doctor also sent a letter to defendant, requesting that plaintiff's medical condition be accommodated. (<u>Id.</u>). Brown responded to plaintiff via email, informing plaintiff that such issues should be discussed with Miller. (DRDF ¶ 94). On June 2, Miller called plaintiff's doctor to discuss plaintiff's limitations. (DRDF ¶¶ 95, 97).

Also on June 2, Miller called plaintiff into her office, and gave plaintiff a "Final Warning" memo, dated May 26, 2004. (DRDF ¶ 99; Pl.'s Decl., Ex. 28.) The memo listed several of Clark's prior complaints, including the May 21 incident. (<u>Id.</u>). Plaintiff was informed that her employment would be terminated if she refused work or gave resistance to her attorneys on work requests. (<u>Id.</u>).

In July 2004, plaintiff again received performance evaluations from the three attorneys to whom she was assigned. (Pl.'s Decl., Exs. 29-31). Two of plaintiff's supervising attorneys, McAdam and Fred Sanderson ("Sanderson"), gave plaintiff an overall rating of "meets expectations." (<u>Id.</u>, Ex. 29, 30). McAdam's evaluation does note plaintiff's difficulty in working with Clark, however, and references his own past difficulties in working with plaintiff. (<u>Id.</u>, Ex. 29). Clark gave plaintiff an overall rating of "marginal" and noted numerous areas of deficiencies. (<u>Id.</u>, Ex. 31.)

On August 30, Plaintiff asked a paralegal to assist her in preparing subpoenas in order to complete an assignment from Clark.  (DRDF ¶¶ 105, 107).  Clark had specifically told plaintiff not to request assistance from a paralegal in completing that particular assignment.  (Clark Decl. ¶ 13). Plaintiff was terminated the next day, on September 1, 2004. (DRDF ¶ 110).  Miller informed plaintiff she was being terminated for insubordination.  (<u>Id.</u>).

On October 18, 2004, Plaintiff filed a complaint with the California Department of Fair Employment and Housing (DFEH) and the Equal Employment Opportunity Commission (EEOC).  (Miller Decl., Ex. A).

**STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

> Under summary judgment practice, the moving party
>
> always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  <u>Id.</u> at 324.  Indeed,

10

1  summary judgment should be entered against a party who fails to
2  make a showing sufficient to establish the existence of an
3  element essential to that party's case, and on which that party
4  will bear the burden of proof at trial.  Id. at 322.  In such a
5  circumstance, summary judgment should be granted, "so long as
6  whatever is before the district court demonstrates that the
7  standard for entry of summary judgment, as set forth in Rule
8  56(c), is satisfied."  Id. at 323.

9      If the moving party meets its initial responsibility, the
10 burden then shifts to the opposing party to establish that a
11 genuine issue as to any material fact actually does exist.
12 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
13 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.
14 253, 288-289 (1968).  In attempting to establish the existence of
15 this factual dispute, the opposing party may not rely upon the
16 denials of its pleadings, but is required to tender evidence of
17 specific facts in the form of affidavits, and/or admissible
18 discovery material, in support of its contention that the dispute
19 exists.  Fed. R. Civ. P. 56(e).  The opposing party must
20 demonstrate that the fact in contention is material, i.e., a fact
21 that might affect the outcome of the suit under the governing
22 law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986),
23 and that the dispute is genuine, i.e., the evidence is such that
24 a reasonable jury could return a verdict for the nonmoving party,
25 Id. at 251-52.

26     In the endeavor to establish the existence of a factual
27 dispute, the opposing party need not establish a material issue
28 of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 289.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87, 106 S. Ct. at 1356.

**ANALYSIS**

**I.   Americans with Disabilities Act Claims**

1    The Americans with Disabilities Act of 1990, 42 U.S.C. §

2    12101, et.seq., prohibits an employer from discriminating

3    "against a qualified individual with a disability because of the

4    disability."  42 U.S.C. § 12112(a); Kennedy v. Applause, Inc., 90

5    F.3d 1477, 1480 (9th Cir. 1996).  To survive a motion for summary

6    judgment under the ADA, plaintiff must establish the following

7    elements of a prima facie case of disability discrimination:(1)

8    that she was a disabled person within the meaning of the ADA; (2)

9    that she was a "qualified individual"; (3) that the defendant

10   terminated her, or otherwise unlawfully discriminated against her

11   in regard to the terms, conditions and privileges of employment;

12   (4) because of her disability.  Americans with Disabilities Act

13   of 1990, 42 U.S.C.A. § 12101 et seq.; See Nunes v. Wal-Mart

14   Stores, Inc., 164 F.3d 1243 (9th Cir. 1999).

15       The court applies the burden shifting approach set forth by

16   the United States Supreme Court in McDonnell Douglas Corp. v.

17   Green, 411 U.S. 792 (1973).  Under this approach, plaintiff must

18   first establish a prima facie case of discrimination.  In doing

19   so, plaintiff may produce indirect evidence that gives rise to an

20   inference of discriminatory motive.  See Transworld Airlines,

21   Inc. v. Thurston, 469 U.S. 111, 121 (1985).

22       Once plaintiff makes this initial showing, the burden shifts

23   to the employer to articulate a legitimate, non-discriminatory

24   reason for the adverse employment action.  See EEOC v. Hacienda

25   Hotel, 881 F.2d 1504, 1514 (9th Cir. 1989).  The ultimate burden

26   of persuasion, however, remains with the plaintiff.  Texas Dep't

27   of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

28

1       If the employer articulates a legitimate, non-discriminatory

2   reason for the adverse employment action, the plaintiff must

3   demonstrate that the reason is a pretext for discrimination.  The

4   plaintiff may demonstrate pretext in one of two ways: "(1)

5   indirectly, by showing that the employer's proffered explanation

6   is unworthy of credence because it is internally inconsistent or

7   otherwise not believable, or (2) directly, by showing that

8   unlawful discrimination more likely motivated the employer."

9   Chuang v. Univ. of Calif. Davis, Board of Trustees, 225 F.3d

10  1115, 1127 (9th Cir. 2000).  The factual inquiry regarding

11  pretext requires a new level of specificity.  Burdine, 450 U.S.

12  at 255.  Plaintiff must produce specific and substantial evidence

13  that the defendant's reasons are really a pretext for

14  discrimination.  Aragon v. Republic Silver State Disposal, Inc.,

15  292 F.3d 654, 661 (9th Cir. 2002).

16      **A.   Disability within the Meaning of the ADA**

17      The ADA defines "disability" as "(A) a physical or mental

18  impairment that substantially limits one or more of the major

19  life activities of [an] individual; (B) a record of such an

20  impairment; or (c) being regarded as having such an impairment."

21  42 U.S.C. § 12102(2).  "In general, 'substantially limited'

22  refers to the inability to perform a major life activity as

23  compared to the average person in the general population or a

24  significant restriction 'as to the condition, manner, or

25  duration' under which an individual can perform the particular

26  activity."  Thompson v. Holy Family Hosp., 121 F.3d 537, 539 (9th

27  Cir. 1997).

28

14

Defendant asserts that plaintiff was not legally disabled and has not proffered sufficient evidence to establish a disability within the meaning of the ADA.  Plaintiff submitted the declaration of her primary care physician, which indicates that plaintiff suffers from migratory polyarthritis.  (Sutter Decl. ¶¶ 11-13).  According to her doctor, plaintiff's condition limits her ability to walk or stand to thirty minutes at a time, and on some days plaintiff might only be able to walk or stand for as little as ten minutes.  (Sutter Decl. ¶ 17.)  Equal Employment Opportunity Commission regulations include walking as a major life activity, within the meaning of the ADA.  29 C.F.R. § 1630.2(1).  To the extent plaintiff was limited to merely a half hour per day of walking, such a restriction on the duration that plaintiff would be able to perform a major life activity could be considered "significant."  Accordingly, plaintiff has raised a genuine issue of material fact as to whether she was legally disabled under the ADA.

**B.   Qualified Individual**

The ADA defines the second prong of the prima facie case, "qualified individual," as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Plaintiff has proffered evidence that she possessed the requisite skills and qualifications for the position of legal secretary and that she could, and did, perform the essential functions of her job at the time of her termination.  Defendant argues that plaintiff was incapable of performing her job, and

15

was thus not qualified within the meaning of the ADA, due to her insubordination and poor attitude.

Defendant relies heavily on a Seventh Circuit case, <u>Hammel v. Eau Galle Cheese Factory</u>, 407 F.3d 852, 862-65 (7th Cir. 2005), for the proposition that a plaintiff's poor performance may preclude a finding that plaintiff was a qualified individual capable of performing the essential functions of the employment position. Assuming *arguendo* that this circuit would adopt the same standard as applied in <u>Hammel</u>, the facts of that case are distinguishable from the instant case. In <u>Hammel</u>, the plaintiff had a history of poor performance, from the first day of his employment through his termination, and was chronically deficient in performing several tasks essential to his job.

In the instant case, plaintiff has offered evidence that her work performance remained satisfactory in many respects and that she continually received positive evaluations from two of the three attorneys to whom she was assigned. (Pl.'s Decl., Exs. 29, 30.) Defendant's proffered evidence of plaintiff's poor performance is certainly relevant and appropriately considered as evidence of a legitimate non-discriminatory motive for any adverse employment action, which may then be challenged by plaintiff as pretext for a discriminatory motive. However, it is not clear that such evidence should be used in the court's inquiry as to whether plaintiff was a "qualified individual," capable of performing the essential functions of her job.

Accordingly, plaintiff has raised a genuine issue of material fact as to whether she was a qualified individual under the ADA.

16

C.   **Unlawful Discrimination Because of Disability**

The ADA prohibits employers from discriminating against a qualified individual with a disability in regard to discharge of the employee, or in regard to other terms, conditions and privileges of employment.  42 U.S.C. § 12112(a).  Such prohibited discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(a).  Plaintiff's complaint can be broadly interpreted as alleging four types of discriminatory actions: (1) termination, (2) retaliation, (3)failure to accommodate, and (4)creation of a hostile work environment.  (Pl.'s Comp., filed October 19, 2005, at ¶¶ 30, 34.)

1.   **Termination because of disability**

Both parties have admitted that plaintiff was terminated on September 1, 2004.  Plaintiff alleges that defendant terminated her because of her disability.  Defendant alleges that plaintiff was terminated as the result of insubordination and poor performance.

a.   **Prima Facie Case**

Plaintiff bears the initial burden of proffering evidence that she was terminated because of her disability.  Plaintiff contends that defendant targeted plaintiff for termination as soon as she returned from disability leave.  Plaintiff relies on her history of generally positive performance evaluations, including the overall positive evaluations she received from McAdam and Sanderson just one month before her termination as evidence that her performance was satisfactory and that defendant

17

had no reason to terminate her for poor performance.  To
establish a discriminatory motive for her termination, plaintiff
relies primarily on the temporal proximity between the date when
Clark first learned of plaintiff's limitations, in August 2003,
and the ensuing complaints lodged by Clark, starting in November
2003.

Plaintiff first informed Clark of her medical condition, and
subsequent need for accommodations with respect to her walking
limitations, in August 2003.  Clark had not been informed of
plaintiff's medical condition prior to August.  Plaintiff
discussed her inability to make numerous trips to Clark's office
with both Clark and Miller at that time.  Clark agreed to reduce
the number of trips plaintiff was asked to make.  At least two of
the complaints lodged by Clark, however, were based, in part,
upon plaintiff's refusal to leave her desk to deliver documents
or files.  Plaintiff asserts that Clark continued to ask her to
perform tasks that required walking even on days that plaintiff
was suffering from arthritic flare-ups.  In November 2003, within
three months of Clark learning of plaintiff's medical condition,
Clark lodged her first emailed complaints regarding plaintiff's
unresponsiveness.

Plaintiff also notes the disparity between Clark's
dissatisfaction with plaintiff's work performance, and the
generally positive performance evaluations the plaintiff received
from her other attorneys.  In July 2003, a month prior to Clark
learning of plaintiff's limitations, all three of plaintiff's
attorneys, including Clark, gave plaintiff positive performance
evaluations.  The next August, just one month before her

18

termination, plaintiff continued to receive satisfactory

performance evaluations from both McAdam and Sanderson, while

Clark rated plaintiff as "marginal."

### b.   Legitimate, Nondiscriminatory Reason

As plaintiff has met her initial, minimal burden of showing

an inference of discriminatory motive in her disciplinary record

and eventual termination, the burden shifts to defendant to

proffer a legitimate, nondiscriminatory reason for plaintiff's

termination.  Defendant proffers evidence that plaintiff was

terminated due to insubordination, performance issues, and

attendance problems, many of which preceded her disability leave

and her assignment to Clark.  (DSUF ¶¶ 8-31.)

In July 2001, nine months before plaintiff commenced

disability leave, the three attorneys to whom plaintiff was

assigned completed performance evaluations of plaintiff.  In

contrast to his 2000 evaluation, Tyra noted ten areas where

plaintiff required some improvement and eleven other areas where

she required significant improvement.  (Pl.'s Decl., Ex. 4).

Tyra also stated in his evaluation that he felt "unsupported" by

plaintiff, that she responded to his work requests by telling him

of her workload for her other attorneys, and that her personal

phone calls appeared excessive.  (Id.).

Shortly after returning from her leave, plaintiff was

counseled for making excessive personal calls, violating the

firm's dress code by wearing a sweat-suit, and walking out of

Baum's office while being counseled.  (DSUF ¶ 11.)

In his August 2003 performance evaluation, McAdam did rate

plaintiff overall as meeting expectations; however, there were

several categories where McAdam rated plaintiff as only
"marginal." (Pl.'s Decl., Ex. 19). His evaluation also notes
that plaintiff sometimes took an argumentative tone with
attorneys and staff and that she needed improvement in working
with her coworkers. (<u>Id.</u>).

On November 24, 2003, Clark sent three emails to Miller,
complaining of plaintiff's unresponsiveness to assignments and
that plaintiff delayed completing tasks for Clark. Plaintiff was
counseled by Miller regarding these complaints and received a
written warning on December 19, 2003. Clark noted an improvement
in plaintiff's performance following this counseling. In March
2004, however, Clark again emailed a complaint to Miller about
plaintiff's refusal to print documents for Clark. In April,
plaintiff was again "written up" when she questioned a partner
about the propriety of Clark's request for a hotel reservation.
In a May 21 email to Miller, Clark once again complained of
plaintiff's unresponsiveness, this time to a request to retrieve
certain files. In response to this complaint, Miller again
counseled plaintiff.

On June 2, Miller called plaintiff into her office, and gave
plaintiff a "Final Warning" memo, dated May 26, 2004. The memo
listed several of Clark's prior complaints, including the May 21
incident. Plaintiff was informed that her employment would be
terminated if she refused work or gave resistance to her
attorneys on work requests.

On August 30, Plaintiff asked a paralegal to assist her in
preparing subpoenas in order to complete an assignment from
Clark. Clark lodged a complaint, stating Plaintiff was

specifically told not to request assistance from a paralegal in completing that particular assignment.  Plaintiff was terminated the next day, on September 1, 2004.  Miller informed plaintiff she was being terminated for insubordination.

Defendant has provided sufficient evidence of a legitimate, nondiscriminatory reason for terminating plaintiff. Consequently, the burden then shifts back to the plaintiff to rebut these proffered reasons as pretextual.

### c.   Evidence of Pretext

Plaintiff contends that her disciplinary record and history of poor work performance, based upon Clark's complaints and others, are unjustified and, therefore, a pretext for defendant's discriminatory motive.  Plaintiff first challenges the complaints and infractions noted prior to her assignment to Clark, including Tyra's negative review of plaintiff, and reprimands for dress code violations and making personal phone calls.  Tyra conducted his 2001 performance evaluation approximately four months after plaintiff complained that he made a derogatory comment about one of his clients.  Plaintiff asserts that Tyra's negative review was in retaliation for this complaint.  Plaintiff also contends the dress code policy was not uniformly enforced and that she was reprimanded for wearing shoes necessary to alleviate her swollen feet.  In response to her reprimand for making excessive personal phone calls, plaintiff states that at least some of her calls were related to seeking treatment for her medical condition, and therefore should not have been subject to any disciplinary action.

1    The court finds this evidence insufficient to show pretext.

2   Tyra wrote his evaluation more than four months after plaintiff's

3   complaint about the derogatory comment.   A claim of retaliation

4   based on temporal proximity is too attenuated to serve as

5   specific and substantial evidence of pretext.   Plaintiff also

6   does not dispute that her sweat-suit did not violate the dress

7   code or that at least some of her personal phone calls were

8   unrelated to her medical care.   Plaintiff has failed to offer

9   specific and substantial evidence that these reprimands were more

10  likely motivated by unlawful discrimination or that any of the

11  evidence proffered by defendant regarding her early history of

12  performance problems is unworthy of credence.

13    Plaintiff also argues that the complaints lodged by Clark

14  were not legitimately based on any actual deficiencies in

15  plaintiff's work performance.   Plaintiff contrasts Clark's 2004

16  evaluation to the evaluations from her other two attorneys,

17  McAdam and Sanderson.   While Clark gave plaintiff an overall

18  rating of only "marginal" and noted numerous areas of

19  deficiencies, the other two attorneys both gave plaintiff an

20  overall rating of "meets expectations."   However, McAdam's

21  evaluation notes plaintiff's difficulty in working with Clark and

22  references his own past difficulties in working with plaintiff.

23  Accordingly, the court does not agree with plaintiff's contention

24  that Clark's 2004 evaluation was a complete aberration and is not

25  credible.

26    Plaintiff also asserts that Clark's complaints, from

27  November 2003 to plaintiff's termination, were unjustified and

28  that plaintiff was, in fact, always performing adequately.   In

response to Clark's complaint regarding the request for a judge's phone number, plaintiff asserts she was unable to locate the information Clark requested and that she gave Clark another phone number that she felt adequately responded to Clark's request.   In response to Clark's complaints regarding her refusal to print documents, plaintiff asserts that her printer was not working on the day Clark made her requests and that she asked Clark to print the documents on her own printer.   As to Clark's May 21 complaint that plaintiff refused to retrieve certain files for Clark, plaintiff asserts that at the time of the request, she explained to Clark that she was experiencing increased swelling and pain, due to a building evacuation the previous day, and asked Clark to seek other assistance in obtaining the files.

The court finds these explanations insufficient evidence that Clark's complaints were pretextual.   Plaintiff does dispute that she engaged in the behavior complained of by Clark, or that she sometimes refused requests from Clark without arranging for another employee to assist her.   She cites to no evidence that the behavior complained of by Clark was accepted from other employees.   Instead she merely argues that she should not have been reprimanded for it.

Plaintiff also challenges the legitimacy of Clark's complaint regarding plaintiff's inquiry to a partner before making a hotel reservation requested by Clark.   Plaintiff notes that she had been praised by Clark before for "seeking clarification," and that the firm had recently adopted a new policy regarding costs charged to clients.   (See Pl.'s Decl., Ex. 25).   Plaintiff was not "seeking clarification" from Clark,

however.   Instead, she was questioning Clark's authority to incur
the charge.   And plaintiff's reliance on the cited policy is
unavailing, as the policy refers to costs in excess of $1,000,
and plaintiff does not contend that it was the amount of the
requested reservation that was at issue, but rather Clark's
ability to make the reservation at all.

Finally, plaintiff challenges Clark's final complaint
regarding plaintiff's use of a paralegal to help prepare
subpoenas.   It is true that plaintiff was told by defendant to
request help from other legal secretaries and administrative
staff when necessary.   However, plaintiff was specifically told
not to request the help of a paralegal in the completion of this
specific task.   Plaintiff did so, contrary to Clark's direct
instructions.   Plaintiff does not dispute that she requested help
from a paralegal as opposed to another member of the secretarial
or administrative staff.   Nor does she dispute that Clark
instructed her not to request the paralegal's help.

Finally, plaintiff challenges the credibility of the memos
and other documentation contained in her personnel file, claiming
that some items were created after her termination or were
falsified all together.   Such claims are without merit.
Plaintiff is unable to cite to any evidence indicating that the
memos were created at a later date, other than her declaration
that she did not see certain items in her personnel file when she
reviewed it in May.   (PSDF ¶ 103).   Additionally, the fact that
some documents are printed with a heading for the firm's San
Francisco office is unpersuasive, as defendant cites to evidence
that such headings are computer-generated templates available in

all of defendant's offices, rather than pre-printed.  (Dep. of Rachel Miller ("Miller Dep."), Ex. 3 to Decl. of Daniel S. Weiss, filed February 6, 2007, at 99:13-14).

Overall, the court finds the evidence proffered by plaintiff to challenge her disciplinary record and history of poor work performance does not meet the level of specific and substantial evidence necessary to rebut defendant's legitimate, nondiscriminatory reason for her termination.  Plaintiff's explanations for the various complaints lodged against her do not contradict defendant's evidence of an extensive and continuous pattern of documented complaints regarding plaintiff's work performance, unresponsiveness, and insubordination.  Plaintiff has not proffered sufficient evidence to demonstrate that defendant's legitimate, nondiscriminatory reason is not credible, or that unlawful discrimination was the more likely motivation for her termination.  As such, plaintiff has failed to meet her burden of showing that defendant's proffered reason is merely a pretext for discrimination.

### 2.   Retaliation for complaints regarding disparate treatment and requests to be accommodated

In order to establish a prima facie case for retaliation in violation of the ADA, plaintiff must demonstrate that (1) she engaged in a protected activity, (2) defendant subjected her to an adverse employment action, and (3) there is a causal link between the protected activity and the defendant's action.  See Brown v. City of Tucson, 336 F.3d 1181, 1187 (2003) (outlining the elements of a prima facie case of ADA retaliation under a burden-shifting analysis).

1    Plaintiff alleges she was wrongfully terminated because she
2  requested accommodations for her disability and lodged complaints
3  regarding disparate treatment after she returned from disability
4  leave.[7]  Defendant contends plaintiff fails to establish a prima
5  facie case of retaliation, claiming that plaintiff was not
6  engaged in protected activity and is unable to show a retaliatory
7  motive for her termination.

8    On November 5, 2003, plaintiff sent an email complaint to
9  Shirley Kitzmann, an administrator in the firm's Chicago office.
10 In her complaint, plaintiff states she felt "singled out" since
11 her return from disability leave, in addition to other
12 allegations of favoritism in the Sacramento office.  (Pl.'s
13 Decl., Ex. 21).  Additionally, her email alleges that in response
14 to plaintiff's requests for assistance, Miller commented, "you
15 seem to have trouble doing your work."  (Id.)  On May 27, 2004,
16 plaintiff also sent a letter to Brown, the managing partner of
17 the Sacramento office.  (Cullison Decl., Ex. 40).  In her letter,
18 plaintiff complains that defendant was not accommodating
19 plaintiff's medical condition and that Clark's complaints were
20 unfounded.

21   Defendant claims plaintiff's complaints to Kitzmann and
22 Brown did not allege illegal discrimination and therefore were
23 not protected activity.  The ADA prohibits discrimination because

24
25      [7]   Plaintiff, in her opposition, attempts to argue that
   her termination was also in retaliation for complaints she made
26 regarding derogatory and offensive comments made by Tyra and
   others.  (PSDF ¶¶ 21, 22).  Even assuming that plaintiff could
27 show that the temporal proximity between plaintiff's complaints,
   made more than two years before her termination, was not too
28 attenuated, such complaints are irrelevant to a claim for
   *disability* discrimination and retaliation under the ADA.

an "individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge" under the ADA.  42 U.S.C. § 12203(a).  Plaintiff's communications go beyond the complaints of mere pettiness and favoritism that defendant cites, and specifically state that she feels she has been singled out and has been refused requested accommodations since her return from disability leave.  The acts complained of by plaintiff could constitute discrimination under the ADA and making good-faith complaints regarding such alleged discrimination is protected activity.

Defendant next contends that plaintiff has failed to establish a retaliatory motive for her termination.  In cases of retaliation, temporal proximity between the protected activity and the adverse employment action can be sufficient prima facie evidence of discriminatory motive.  See Brown v. City of Tucson, 336 F.3d 1181, 1187 (2003) (noting that "very close" temporal proximity can be sufficient evidence of retaliatory motive in certain cases).  Defendant contends that the connection between the complaints and the alleged retaliatory conduct is too attenuated, citing to several cases where courts have found the connection to be too remote when the complaints and retaliatory conduct were separated by more than a few months.  (Def.'s Mot. for Sum. J., filed Dec. 21, 2006, at 17.)

It is true that plaintiff's termination came more than three months after her complaint to Brown, and nearly a year after her email to Kitzmann.  However, plaintiff's complaint to Kitzmann preceded Clark's first email complaint by only three weeks, and the Final Warning memo that served as the basis for plaintiff's

termination was delivered to her just five days after her letter to Brown.  It is possible, under this timeline, that Clark's complaints were precipitated by the complaint to Kitzmann, and the disciplinary action taken against plaintiff was accelerated by the complaint to Brown.

Nevertheless, as discussed above, defendant has proffered a legitimate, non-retaliatory reason for plaintiff's termination. Namely, defendant terminated plaintiff based upon a pattern of poor work performance and insubordination.  Also as discussed above, plaintiff is unable to cite to specific and substantial evidence that the reason proffered by defendant is mere pretext. Especially in the context of her retaliation claim, plaintiff proffers no evidence that Clark was even aware of plaintiff's communications to Kitzmann and Brown, nor any specific and substantial evidence that Clark's complaints were in retaliation for those communications.

### 3. Failure to accommodate

Unlawful discrimination under the ADA includes "not making reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  In order to identify and implement appropriate reasonable accommodations, employers are required to engage in an "interactive process" with disabled employees. Barnett v. U.S. Air, 228 F.3d 1105, 1111-14 (2000). Employers may not deny a reasonable accommodation absent a showing that such an accommodation would pose an undue hardship to the defendant. Id. However, employers are also not required to provide the "best" accommodation possible – they are merely

28

required to provide an adequate accommodation to enable the
employee to perform the position's essential functions.   29
C.F.R. § 1630.9.

Plaintiff alleges that defendant failed to provide
reasonable accommodations when it denied her request to transfer
away from Clark, denied her request to have Clark move to another
office, and failed to limit the number of trips that plaintiff
was required to make to Clark's office (Pl.'s Opp'n. to Def.'s
Mot. for Summ. J., at 12-13).   Plaintiff further contends that on
some occasions when she requested assistance from other support
staff, such assistance was not provided.

Defendant contends that it engaged in the interactive
process in good faith and provided plaintiff with several
reasonable accommodations that enabled her to perform the
essential functions of her job.   Defendant extended plaintiff's
medical leave multiple times after her initial request, for an
additional seven months of leave.   When plaintiff returned to
work, defendant honored her doctor's restriction and allowed her
to work a part-time schedule for more than two months.   Prior to
plaintiff resuming a full-time schedule, Baum and plaintiff's two
supervising attorneys met with plaintiff to discuss appropriate
accommodations.   During that meeting plaintiff stated that she
was satisfied with the accommodations defendant offered.

From July 2003 through May 2004, defendant had multiple
conversations with plaintiff regarding the adequacy of the
accommodations offered and whether other accommodations were
needed.   As late as October 2003, plaintiff told defendant that
the accommodations currently offered were adequate.   The evidence

reflects that plaintiff did not raise the issue of inadequate
accommodations again until March or April 2004.  At that time
Clark offered again to limit plaintiff's trips to her office,
Miller reiterated the availability of other staff to assist
plaintiff,[8] and the parties discussed the feasibility of moving
Clark's office or plaintiff's workstation.  It was only after
plaintiff declined to move her workstation, and when plaintiff
was facing another reprimand for complaints from Clark, that
plaintiff obtained a letter from her doctor and wrote to Brown to
complain of defendant's refusal to transfer her away from Clark.
Defendant responded to plaintiff's last request by calling her
doctor and discussing plaintiff's limitations.  The record
indicates that plaintiff made no further complaints regarding her
accommodations before she was terminated on September 1, 2004.

The court finds that defendant engaged in the interactive
process in good faith, providing plaintiff with several
accommodations that enabled her to perform the essential
functions of her job.  In fact, in support of her other ADA
claims, plaintiff herself even relies on the fact that she was
able to perform her job's essential functions adequately for her
other two attorneys with the accommodations that were offered.

---

[8]   Plaintiff contends that on some occasions other staff
declined to assist her in performing her tasks, and that this
constitutes a failure to accommodate.  (Pl.'s Opp'n., at 12-13)
The ADA does not require an employer to assign other employees to
perform a disabled employee's essential job duties.  See, e.g.,
Robertson v. Neuromedical Ctr., 161 F.3d 292, 295 (5th Cir.
1998).  The fact that defendant attempted to do so here, but that
on isolated occasions such assistance was not available, does not
render defendant liable under the ADA.

1    Essentially, the crux of plaintiff's failure to accommodate
2    argument relates to the impasse reached over how to address the
3    distance between Clark's office and plaintiff's workstation.
4    Plaintiff suggested that Clark move her office to be closer to
5    plaintiff's workstation.  As an alternative, defendant offered to
6    move plaintiff's workstation closer to Clark's office.  Plaintiff
7    declined this request.[9]  Plaintiff then requested a transfer away
8    from Clark.  Defendant contends plaintiff's requests to be
9    transferred away from Clark were not reasonable in light of
10   defendant's policy against transferring employees away from their
11   supervising attorneys when there are ongoing performance issues.

12   The court agrees with defendant that plaintiff's request to
13   be transferred away from Clark was not a reasonable
14   accommodation.  In U.S. Airways, Inc. v. Barnett, 535 U.S. 391
15   (2002), the Supreme Court addressed the reasonableness of a
16   transfer accommodation that required the employer to violate an
17   established seniority system.  Noting the advantages of a
18   consistent, uniform seniority system, and the undermining effect
19   that violations of such a system would have on employee
20   performance and loyalty, the Court found that in the typical run
21   of cases, an accommodation that requires the employer to violate

22

23        [9]   Plaintiff argues in her opposition that moving her
     workstation closer to Clark's office would have moved her further
24   away from her other two attorneys.  (PRUF ¶ 44)  Plaintiff offers
     no evidence that this concern was ever communicated to defendant.
25   In fact, in the email plaintiff sent to Miller declining to move
     her workstation, plaintiff indicated only that she would be
26   uncomfortable with her back to the hallway.  (DSUF ¶ 44; Cullison
     Decl., Ex. 32).  Plaintiff's uncommunicated concerns regarding
27   the overall effectiveness of the accommodation offered by
     defendant are irrelevant to the question of whether defendant is
28   to blame for the break-down in the interactive process.

such a system is not reasonable.  The Court concluded that an employer's showing of a violation of the system can be, by itself, sufficient to support summary judgment.

The policy that defendant had in place here has goals similar to those embodied in a seniority system: by limiting transfers when an employee has noted discipline and performance issues, defendant's policy encourages employees to rectify problems, promotes stability and continuity in supervisory assignments, and limits disruptions caused when other employees are required to accept the transferred employees assignments. The Court in U.S. Airways noted that a plaintiff may still be able to show that violating the policy would be reasonable in the particular case, including evidence that the policy was violated routinely or had numerous exceptions.  Plaintiff, however, has failed to make such a showing here.  As such, requiring defendant to violate its stated policy against transferring employees with performance problems would not be reasonable in this case.

The court finds that any break-down in the interactive process can be attributed to plaintiff's declination of defendant's offer to move her to a work station closer to Clark,[10] her delay in informing defendant that the accommodations being offered were inadequate, and her repeated failure to suggest alternative reasonable accommodations.  Additionally,

---

[10]   See 29 C.F.R. § 1630.9(d) (West 2007) ("[I]f such individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability.").

1  plaintiff has failed to identify a reasonable accommodation that

2  defendant did not grant.  To the contrary, defendant provided

3  plaintiff with several adequate reasonable accommodations, at

4  least one of which plaintiff declined.

5        **4.    Hostile work environment**

6        Plaintiff also claims that the defendant created a hostile

7  work environment in violation of the ADA.  (Pl.'s Comp., at ¶ 34;

8  Pl.'s Opp'n., at 22-23.)  In support of this argument, plaintiff

9  characterizes Clark's complaints and criticism of plaintiff as

10 "harassment."  Id.

11       The Ninth Circuit has not held that a hostile work

12 environment claim is actionable under the ADA.  See Brown v. City

13 of Tucson, 336 F.3d 1181, 1190 (9th Cir. 2003) (stating "[o]ur

14 court has not yet held that such a claim exists, let alone what

15 its source in the statute may be.  We decline to do so here.").

16 Plaintiff fails to cite to any case law indicating otherwise.

17 (Pl.'s Opp'n., at 22-23.)

18       However, assuming arguendo that the Ninth Circuit would

19 recognize a hostile work environment claim under the ADA,

20 plaintiff still fails to establish such a claim.  Using the

21 standard applicable to a claim under Title VII of the Civil

22 Rights Act of 1964, plaintiff must show that defendant's conduct

23 was "sufficiently severe or pervasive to alter the conditions of

24 the victim's employment and create an abusive working

25 environment."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-

26 22 (1993).  "Conduct that is not severe or pervasive enough to

27 create an objectively hostile or abusive work environment – an

28

environment that a reasonable person would find hostile or

abusive – is beyond Title VII's purview."  Id.

Plaintiff has not alleged conduct that is sufficiently

severe and pervasive to support a finding of an objectively

hostile or abusive work environment.  See Li Li Manatt, 339 F.3d

at 798 (holding that racial jokes, ridicule of plaintiff's

accent, and act of pulling eyes back to imitate or mock the

appearance of Asians were insufficient to create a hostile

working environment); Vasquez v. County of Los Angeles, 307 F.3d

884, 893 (9th Cir. 2002) (finding no hostile work environment

where employee was told that he had "a typical Hispanic macho

attitude," that he should work in the field because "Hispanics do

good in the field" and where he was yelled at in front of

others); Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1111 (9th

Cir. 2000) (finding no hostile work environment where the

supervisor referred to females as "castrating bitches,"

"Madonnas," or Regina, and referred to plaintiff as "Medea").

Plaintiff references only defendant's criticism of her job

performance. The court finds that no reasonable person would find

such criticism to be objectively abusive.  Additionally, as with

her retaliation and discrimination claims discussed above,

plaintiff has failed to establish that defendant's allegedly

abusive conduct was because of plaintiff's disability instead of

defendant's legitimate, nondiscriminatory concerns regarding her

poor performance.

**D.  Plaintiff's ADA Claims Fail**

Plaintiff has not met her burden of establishing a causal

connection between her termination and a retaliatory or

34

discriminatory motive.  Additionally, plaintiff has failed to offer sufficient evidence that defendant failed to accommodate plaintiff's disability.  Finally, even assuming that a hostile work environment claim would be actionable under the ADA, the actions complained of by plaintiff do not rise to the level of severe and pervasive conduct creating an objectively abusive environment.  Accordingly, defendant's motion for summary judgment on all of plaintiff's ADA claims is GRANTED.

**II.  Age Discrimination in Employment Act**

Plaintiff also claims defendant violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, when it offered plaintiff an open paralegal position, but at a lower salary than plaintiff was earning at the time. Plaintiff refused the position.  Plaintiff alleges that six months later, defendant hired a younger woman for the same job at a higher salary than that offered to the plaintiff.  Plaintiff was on disability leave at the time defendant hired the new paralegal.

Defendant moves to dismiss plaintiff's claim on the ground that she has failed to exhaust her administrative remedies, as required by the ADEA.  The ADEA requires a person seeking relief to first file a charge with the EEOC within 180 days of the alleged unlawful employment practice, or, if the aggrieved person initially instituted proceedings with the state or local administrative agency (such as the California Department of Fair Employment and Housing (DFEH)), within 300 days of the alleged unlawful employment practice.  <u>See</u> 29 U.S.C. § 626(c)-(d). "Failure to file a charge within these required time limits

generally prevents a person from litigating the claim." <u>Sanchez v. Pacific Powder Co.</u>, 147 F.3d 1097, 1099 (9th Cir. 1998).  A plaintiff may litigate incidents not listed in the original administrative complaint only if the acts are of "discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." <u>Oubichon v. North American Rockwell Corp.</u>, 482 F.2d 569, 571 (9th Cir. 1973).

Plaintiff filed a complaint with the DFEH and the EEOC on October 18, 2004, alleging discrimination based solely upon disability.  (Miller Decl., Ex. A.)  In this complaint, plaintiff contended she "was denied an accommodation and retaliated against . . . due to [her] disability." <u>Id.</u>  Plaintiff failed to assert that the alleged discriminatory acts were based upon her age. <u>Id.</u>  In fact, the discriminatory acts alleged in plaintiff's EEOC complaint relate back only to September 2003 and do not include the defendant's hiring of another person for the open paralegal position in June 2002.  <u>Id.</u>

Plaintiff concedes in her declaration and her opposition to the instant motion that her ADEA claim is *not* based upon her termination – the same discriminatory act complained of in her October 2004 EEOC claim – but, rather, is based upon defendant's hiring of another person for the paralegal job in 2002.  This event is not raised at all in plaintiff's EEOC complaint.  Her failure to file an EEOC complaint asserting her age discrimination claim bars her from litigating such a claim under the ADEA.  Additionally, even if plaintiff had exhausted her administrative remedies, she has failed to establish a prima

facie case of age discrimination related to this event, as she

proffers no evidence that the offer of a lower salary or

subsequent hiring of a younger woman were because of plaintiff's

age.[11]   Thus, defendant's motion for summary judgment regarding

plaintiff's ADEA claim is GRANTED.

**III. Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing**

    Plaintiff brings claims for breach of contract and breach of

the implied covenant of good faith and fair dealing.  Plaintiff

does not dispute that her employment was at-will.  (PRDF ¶¶ 1-4.)

Nor does she dispute that no written agreement existed between

her and defendant for continued employment.  (Id.)  Instead,

Plaintiff asserts that her at-will employment status is

"immaterial" to her breach of contract and breach of implied

covenant claims.  (Id.)

    Plaintiff contends that, despite her at-will status, she

retained the right not to be terminated for an illegal purpose or

reason.  To the extent that such a right was violated, however,

plaintiff's claim would be one for wrongful termination in

violation of public policy, or retaliation in violation of an

express statute, rather than a contractual breach.

---

    [11]   Furthermore, defendant offers evidence of a legitimate
nondiscriminatory reason for the lower salary offered to
plaintiff, in that the pay scale for legal secretaries was
generally higher than that for paralegals at the time plaintiff
was offered the job.  (Baum Decl. ¶ 5.)  Defendant's evidence
that the new paralegal was hired only after a new partner joined
the firm, bringing with him a class action lawsuit, also
indicates that the higher salary offered to the new paralegal was
more likely the result of an acute need to fill the position
immediately than a discriminatory motive against plaintiff.  (Id.
¶ 9.)

A claim for a breach of an employment contract requires the actual existence of a contract, either written and oral.  <u>Guz v. Bechtel</u>, 24 Cal.4th 317, 337 (2000) (stating summary judgment is proper "where the undisputed facts negate the existence or the breach of the contract claimed").  Plaintiff has failed to proffer any evidence that her employment was governed by a contract between her and defendant and was anything other than an at-will employment relationship.  Absent any such employment contract, there can also be no breach of the implied covenant of good faith and fair dealing.  This covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*."  <u>Id.</u> at 349 (emphasis in original).  Therefore, the covenant "cannot be endowed with an existence independent of its contractual underpinnings" and "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  <u>Id.</u> at 349-50 (internal citations omitted).  Defendant's motion for summary judgment of plaintiff's claims for breach of contract and breach of implied covenant of good faith and fair dealing are GRANTED.

**IV.   Wrongful Termination in Violation of Public Policy**

Plaintiff also brings a claim for wrongful termination in violation of public policy.  Plaintiff relies on the same facts and arguments for this claim as she does for her ADA retaliation claim.  Namely, plaintiff contends she was terminated in retaliation for complaints and accommodation requests she made to Kitzmann and Brown and that such retaliation is in violation of public policy.

38

An employer's discharge of an employee in violation of a fundamental public policy embodied in a constitutional or statutory provision can give rise to a tort action.  <u>Barton v. New United Motor Manufacturing, Inc.</u>, 43 Cal. App. 4th 1200, 1205 (1996).  In order to sustain a claim of wrongful termination in violation of public policy, plaintiff must prove that her dismissal violated a policy that is fundamental, beneficial for the public, and embodied in a statute or constitutional provision.  <u>Turner v. Anheuser-Busch, Inc.</u> 7 Cal.4th 1238, 1256 (1994) (citing <u>Gantt v. Sentry Insurance</u>, 1 Cal.4th 1083, 1095 (1992)).  Under California law, terminating an employee because of her disability or in retaliation for complaining of discriminatory conduct is sufficient to support a claim for wrongful termination in violation of public policy.  See <u>City of Moorpark v. Superior Court</u>, 18 Cal. 4 th 1143, 1158-61 (1998).

As discussed above under plaintiff's ADA claims, however, plaintiff has failed to establish retaliatory motive for her termination.  Specifically, plaintiff has failed to demonstrate a causal connection between her termination and her accommodation requests and complaints to Kitzmann and Brown.  She has not offered sufficient evidence to dispute defendant's legitimate, nondiscriminatory reason for her termination.  Accordingly, defendant's motion for summary judgment of plaintiff's claim for wrongful termination in violation of public policy is GRANTED.

**E.**   **Intentional and Negligent Infliction of Emotional Distress**

Defendant requests the court to grant summary judgment on plaintiff's claims for intentional and negligent infliction of emotional distress.  It contends plaintiff failed to establish

sufficient evidence of outrageous conduct and that plaintiff's
claims are barred by the exclusive remedy provisions of the
Workers Compensation Act, Cal. Labor Code §§ 3601-02.

"The elements of a cause of action for intentional
infliction of emotional distress are (1) outrageous conduct by
the defendant; (2) emotional distress; (3) severe emotional
distress; and (4) actual and proximate causation of the emotional
distress." Fisher, 214 Cal. App. 3d at 617 (quoting Molko v.
Holy Spirit Assn., 46 Cal. 3d 1092, 1120 (1986)).  Where
plaintiff establishes a viable claim for discrimination,
retaliation, or harassment under the ADA, a claim of intentional
infliction of emotional distress will usually also lie because,
by definition, a "harassment in the workplace is outrageous
conduct as it exceeds all bounds of decency usually tolerated by
a decent society." See id.  Emotional injuries arising from such
discrimination and harassment are by nature outside the scope of
the employment relationship and thus are not precluded by the
exclusive remedy provisions of the Workers' Compensation Act.
Taylor v. Beth Eden Baptist Church, 294 F. Supp. 2d 1074, 1080
(N.D. Cal. 2003) (citing Yanowitz v. L'Oreal USA, Inc., 131 Cal.
Rptr. 2d 575 (2003) (holding that exclusivity did not apply to
claim for negligent infliction of emotional distress against
employer based on allegation that employer had retaliated against
plaintiff for refusing to fire female sales associate who
plaintiff's supervisor thought was unattractive).

However, where the conduct complained of is a normal part of
the employment relationship, such as criticism of an employee's
performance, then a disability or injury arising from that

conduct remains within the exclusive jurisdiction of the Workers'
Compensation Act.  Cal. Lab. Code § 3601; <u>Cole v. Fair Oaks Fire
Protection District</u>, 43 Cal.3d 148, 160-61 (1987).  Emotional
distress injuries fall within the exclusive remedy provision of
Section 3601 unless the basic conditions of Section 3600 are not
met and the employer's conduct contravenes fundamental public
policy or *exceeds the risks inherent in the employment
relationship*.  <u>Livitsanos v. Superior Court</u>, 2 Cal. 4th 744, 815
(1992).

Plaintiff has not established any viable claims for
discrimination, retaliation or harassment under the ADA.  Just as
defendant's complaints, criticisms and subsequent reprimands and
termination fail to rise to the level of a severe and pervasive
hostile work environment, such actions also fail to rise to the
level of outrageous conduct and are nothing more than those
experienced in the normal course of an employment relationship.
Plaintiff's opposition cites to no case law and points to no
evidence in support of her contention that defendant's conduct
was sufficiently outrageous or that such conduct falls outside
the scope of the WCA's exclusive remedy provisions.  (Pl.'s
Opp'n., at 35:15-21.)  Accordingly, Defendant's motion for
summary judgment regarding plaintiff's claims for intentional and
negligent infliction of emotional distress is GRANTED.

/////

/////

/////

/////

/////

**CONCLUSION**[12]

For the foregoing reasons, defendant's motion for summary judgment or, in the alternative, summary adjudication is GRANTED. The Clerk of the Court is directed to close this file.

IT IS SO ORDERED.

DATED: April 2, 2007

FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

---

[12]   Because summary judgment has been granted with respect to all the claims set forth in the complaint, the court need not separately address defendant's motion with respect to plaintiff's claim for punitive damages.  As plaintiff has no viable substantive claim against defendant, she has no claim for any damages against defendant.

42